937 F.2d 624
 37 Cont.Cas.Fed. (CCH) 76,126
 Unpublished Disposition
NOTICE: Federal Circuit Local Rule 47.8(b) states that opinions and orders which are designated as not citable as precedent shall not be employed or cited as precedent. This does not preclude assertion of issues of claim preclusion, issue preclusion, judicial estoppel, law of the case or the like based on a decision of the Court rendered in a nonprecedential opinion or order.
COCHRAN CONSTRUCTION COMPANY, Appellant,
v.
The UNITED STATES, Appellee.
 No. 91-1057.
 United States Court of Appeals, Federal Circuit.
 June 24, 1991.
 
 Before RICH, MAYER and CLEVENGER, Circuit Judges.
 DECISION
 CLEVENGER, Circuit Judge.
 
 
 1
 Cochran Construction Company ("Cochran") appeals the decision of the Armed Services Board of Contract Appeals ("Board") denying Cochran's claim for compensation for additional work performed after completion of its firm fixed-price contract with the Government for renovation of various buildings at Fort Eustis, Virginia. In re Cochran Constr. Co., ASBCA No. 40294 (A.S.B.C.A. Aug. 14, 1990). We affirm because the Board's conclusion was neither arbitrary, capricious, nor unsupported by substantial evidence.
 
 OPINION
 
 2
 The contract required Cochran to install a polymer-based epoxy floor system on the latrine floors. A "Rickles Brown" color, a blend of brown, tan and beige, was specified. Cochran at 2. The Government agreed to an epoxy product which had been on a Government-approved list since 1983. The manufacturer guaranteed that the product was impervious to various chemical solutions but cautioned against the use of strong acids or alkalis. During installation, Cochran added a powdery water-absorbing substance to stiffen the epoxy mixture during application to vertical surfaces. Id. at 4. Shortly after completion, sheet-like parts of many vertical areas began to acquire green, blue-green, or turquoise shades. Random areas on the floors also similarly discolored. Id. at 5. The same subcontractor had been employed, under a different contract, to lay the same epoxy latrine floor in other buildings where, before occupancy by any soldiers, the same discoloration occurred.
 
 
 3
 Cochran sought compensation for remedial work directed to correct the discoloration and appealed to the Board when the contracting officer failed to issue a final decision. The Government submitted testimony from a chemical expert who had found that there was excess moisture in samples taken from the discolored areas, which, when removed, caused the normal color to return. The expert concluded that the powdery additive had reacted with water and the epoxy during improper mixing to cause the discoloration. He opined that the random floor areas resulted from aerosolization of the powder while epoxy for the vertical surfaces was being mixed. Id. at 7. The Government's expert also combined the epoxy product with various cleaners but could induce no similar discolorations. Both before the agency and the Board, Cochran contended that the discoloration was from improper cleaning solutions used by soldiers cleaning the latrines. Id. at 6. Cochran's expert opined that the use of particular cleaners would damage the epoxy permitting water and green dyes contained in cleaning solutions to enter and react with the epoxy. Cochran's expert argued that the Government's tests were inconclusive, but did no contrary testing himself. Id. at 8.
 
 
 4
 The Board noted that the Government was entitled to brown, tan and beige latrine floors and walls under the inspection and warranty clauses of the contract. The Government conceded that under these clauses it must assume the burden of proving a causal relationship between the discoloration of the floors and the improper workmanship. Id. at 8. The Board concluded that the Government's explanation based on improper mixing and curing was reasonable and credible in light of the testimony of its expert, the test results, the unusual pattern of discoloration, and the manufacturer's assertion that the epoxy was resistant to standard cleaning solutions. Id. at 9. Furthermore, the Board concluded that Cochran's rebuttal evidence was discredited because the "cleaning solution" theory did not explain the unusual discoloration pattern or that the discoloration had occurred in unoccupied latrines. In sum, the Board concluded that the Government had proved its case.
 
 
 5
 On appeal, Cochran first contends that the Board's fact-finding on the cause of the discoloration is not supported by substantial evidence. Under statute, we must affirm the Board's determination if we conclude that its factual findings are supported by substantial evidence. 41 U.S.C. Sec. 609(b) (1988). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938). Where "the board's findings of fact are supported by substantial evidence, we will not alter them even though the record may contain evidence supporting a contrary position." Fruin-Colnon Corp. v. United States, 912 F.2d 1426, 1428 (Fed.Cir.1990) (citing Erickson Air Crane Co. v. United States, 731 F.2d 810, 814 (Fed.Cir.1984)).
 
 
 6
 Cochran argues that the Government expert's ultrastructural analysis of the discolored and normal epoxy disclosed no differences between the two and that Cochran's chemical tests showed identity as well, thereby demonstrating that the epoxy matrix was not changed by the use of the powdery additive or the excess water. Furthermore, Cochran contends that the theory of the Government's expert that the powdery additive and water combined with the epoxy to change the color was mere surmise. However, neither contention proves that the Board lacked substantial evidence to conclude that the Government had proved a prima facie case that improper mixing and consequent water absorption caused the color change. Manifestly, the latrine walls were of a different color. The fact that, in many respects, the two differently-colored epoxies were otherwise identical cannot logically explain the basis for the difference. To do so, Cochran would have to demonstrate that these structural and chemical tests were relevant to the color of the epoxy, which it has not done. Furthermore, Cochran's contention that the Government's specifications permit some water absorption does not excuse the development of the impermissible color change from improper mixing with consequent erratic water absorption during cure. In sum, the Board's conclusion that the color change was from water absorption during improper mixing and curing was supported by ample evidence, including the tests of water content, the tests of water removal, accompanied by color reversion, the opinion of the Government's expert, and the evidence about the water-absorbing additive and its aerosolizing properties, which explained the distribution of the color changes.
 
 
 7
 Cochran contends that the Board failed to require the Government to shoulder its conceded burden of proof. Although Cochran acknowledges that the Board expressly required the Government to bear the burden of proof, Cochran contends that the Board demonstrated that it did not abide by this rule because the opinion deals first with Cochran's rebuttal followed by an analysis of the Government's case-in-chief. Having concluded that there was substantial evidence to support the Board's finding as to the cause of the discoloration, we cannot agree that the presentation of that evidence in inverse order upends it. "We review judgments, not the rhetoric in opinions." Lindemann Maschinenfabrik v. American Hoist & Derrick Co., 730 F.2d 1452, 1458 (Fed.Cir.1984).
 
 
 8
 Finally, Cochran contends that the Board selectively criticized Cochran's witnesses and that the Board considered evidence not properly made part of the record. In principle, Cochran's contention is that the Board discredited Cochran's witnesses and did not similarly treat the government's witnesses. We conclude that the Board sought to arrive at a decision based upon all the facts, including the unusual pattern of discoloration that indicated a systematic problem with the vertical surfaces and the fact that discoloration occurred in unoccupied latrines. Cochran's theory simply did not explain these phenomena and was therefore properly found not believable. On the other hand, the Government's theory was internally consistent, explained all the available data, was supported by actual tests and the opinion of an expert, and led to the conclusion that improper workmanship was the cause of the discoloration. As to Cochran's argument that there was no direct evidence that the epoxy floor actually improperly absorbed water before curing, the very purpose of the addition of a hygroscopic powdery substance was for the epoxy to absorb water to stiffen it before curing. We therefore affirm.